**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 4:17cr003 (RCY) |
| | ) | |
| EDWARD ZINNER, | ) | |
| | ) | |
| Petitioner. | ) | |

## <u>MEMORANDUM OPINION</u>

Edward Zinner, a federal inmate, proceeding *pro se*, filed this motion under 28 U.S.C. § 2255 ("§ 2255 Motion," ECF No. 126) to vacate, set aside, or correct his conviction and a host of other related motions.  The Government has responded.  For the reasons set forth below, Zinner's § 2255 Motion (ECF No. 126) and his outstanding motions will be DENIED.

### I.  Procedural History

#### A.  The Guilty Plea

Zinner was charged in a Superseding Indictment with seventeen counts of wire fraud and seven counts of engaging in monetary transactions in property derived from specified unlawful activity.  (ECF No. 37.)  On October 17, 2017, Zinner entered into a Plea Agreement and pled guilty to Count Nineteen of the Superseding Indictment.  (ECF No. 59, at 1.)

Count Nineteen charged as follows:

1.  The factual allegations contained in the General Allegations section of this Indictment are incorporated herein by reference as if set out in full.
2.  On or about the following dates and in the manner described below, in the

Eastern District of Virginia, EDWARD ZINNER, the defendant herein, did knowingly engage and attempt to engage in the following monetary transactions by, through and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, money deposits which represented fraudulently obtained funds from investors, such property having been derived from a specified unlawful activity, that is Wire Fraud in violation of Title 18, United States Code, Section 1343:

. . .

| Count | Date (on or about) | Financial Transaction |
|---|---|---|
| 19 | 9/6/2012 | Transfer of $40,000.00 from Monarch Bank account (account number ending 1156) to E*TRADE account (account number ending 7905) |

(In violation of Title 18, United States Code, Section 1957.)

(Superseding Indictment, ECF No. 37.)

During the plea proceedings, Zinner acknowledged:

If this matter were to proceed to trial, the United States would prove beyond a reasonable doubt, by competent and admissible evidence, the following facts:

1.   In the mid-2000s, EDWARD ZINNER, the defendant herein, (hereinafter "ZINNER"), had been engaged in the related businesses of third-party credit card processing and merchant cash advances.  In or about October 2007, a partnership was formed between ZINNER and another individual in the name of Ocean Equity Group (OEG), with the stated purpose of operating a merchant cash advance business.  In 2011, and again in 2013, the partnership agreement was amended to either reflect ownership percentage changes or to alter the existing ownership between individuals.

2.   In December 2009, ZINNER and another individual formed a Delaware limited liability company in the name of Ocean Equity Payment Solutions, LLC (OEPS).   OEPS operated as a credit card processing business.

3.   Although established separately, in effect, OEG and OEPS operated as one business entity and were referred to commonly as "Ocean Equity." From 2010 to 2016, Ocean Equity (as a joint concern) had between four and forty employees. ZINNER maintained and  exercised control over the

receipt and use of all funds obtained by Ocean Equity, including income earned, investments/loans received and any other funds received.

4.   Ocean Equity earned money from its credit card processing services in two ways - (1) from the lease or sale of credit card processing equipment to the merchant, and (2) from residual fees (residuals) earned from the credit card transactions that were processed by Ocean Equity for the merchant. The residuals earned by Ocean Equity were a few percentage points of the total volume of credit card transactions processed.  Accordingly, in order to generate significant income, Ocean Equity needed to build a large book of business, consisting of hundreds of merchant customers.

5.   In addition to the credit card processing services offered by Ocean Equity, ZINNER also offered and made merchant cash advances to merchants that used Ocean Equity as their credit card processor. A merchant cash advance is a purchase of future credit card receivables at a discounted rate, but is not considered a loan.  For example, if a merchant desired an immediate cash advance of $20,000, Ocean Equity would purchase $30,000 of the merchant's future credit card receivables in exchange for the $20,000 advance.  Ocean Equity would then collect a certain percentage of the merchant's credit card receivables until the $30,000 agreement was satisfied.

6.   Some of the merchant clients that obtained cash advances from Ocean Equity sought these advances because they could not get financing from traditional sources.  ZINNER marketed the cash advances in Ocean Equity promotional materials as an alternative to traditional financing with the slogan, "We say yes when the bank says no." Consequently, the merchant cash advances made by Ocean Equity were generally risky, with a risk of default or slow payments, which was reflected in the high rates of return.

7.   In 2008 and 2009, during its first years of offering merchant cash advances, Ocean Equity suffered substantial losses due to numerous defaults. ZINNER reported such losses from the operation of Ocean Equity on his 2008 and 2009 personal federal income tax returns in amounts of $659,322 and $182,879, respectively.

8.   Upon the formation of OEG in October 2007, ZINNER and/or others acting on his behalf, began obtaining funds from individuals for use in the merchant cash advance business.  Prior to January 1, 2011, at least $459,091 in private investor/lender funds were obtained by Ocean Equity.  During the period from January 1, 2011, through in or about January 12, 2016, at least an additional approximately $4,513,978 in private investor/lender funds were obtained by Ocean Equity. Such individuals were referred to as both investors and/or lenders and are hereinafter referred to as investors.

9.   In order to entice individuals to invest money with Ocean Equity, ZINNER and/or others acting on his behalf, represented or caused to be represented to potential investors that Ocean Equity would use their invested funds to make merchant cash advances to merchants that also used Ocean Equity's credit card processing services. Representations were made to investors that because the returns earned on the merchant cash advances were so high, Ocean Equity could offer interest rates of 12% - 18% on any money they loaned and/or invested to the company. The investors were typically required to leave their money invested with Ocean Equity for a period of two years and they received monthly interest payments during that time.  The investors were told that their investments were secured by the assets of Ocean Equity.

10.   A number of individual investors entered into written Loan Agreements with Ocean Equity, which expressly provided that the investor was given "a security interest in all assets of the Company up to the full amount of the loan." Certain Loan Agreements also specifically referenced that the invested/loaned funds were to be "used to purchase future Visa MasterCard receivables and/or grow[] the merchant processing portfolio."  ZINNER made various changes to the Loan Agreements over time from 2011-2015.

11.   In addition to the money received from investors, ZINNER also sought and obtained numerous loans for Ocean Equity from a company called Super G Funding (SGF), starting with a $200,000 loan in July 2009. The loans from SGF were typically for a period of 24 - 36 months and had interest rates of about 18%.  Including fees and costs, the annual percentage rates for the loans exceeded 30%. The loans from SGF, which were entered into with OEG or OEPS, were secured by Ocean Equity's credit card processing portfolio and/or merchant cash advance income, and were also personally guaranteed by ZINNER.

12.   For each SGF loan, ZINNER entered into a written Business Loan and Security Agreement with SGF, again, on behalf of either OEG or OEPS. Each of these agreements referenced that the collateral for the loans included residual payments from credit card processing and/or all other assets of the borrower.  In signing these agreements, ZINNER represented: (1) that the loans would not be used for personal, family, or household purposes; and (2) that the identified collateral assets were and would remain free from any and all liens, security interests, encumbrances, claims and interests.

13.   From 2011 through 2016, ZINNER obtained six separate loans through SGF, in the face amount of $3,000,000.  Subtracting initial fees, payments and certain refinancing efforts, ZINNER received approximately $2,565,194.39 in loan proceeds.  At all times from 2011 through 2016, save for a several-month period from July through December 2014, ZINNER had

outstanding loans with SGF.  Total payment due on these loans was approximately $4,374,750.00, and through refinancing and other means ZINNER made payments over these periods of at least $3.4 million.

14.  Although both groups of investors/lenders (including private investors and SGF) were told by ZINNER and/or others acting on his behalf that the funds invested with and/or loaned to Ocean Equity would be used to make merchant cash advances or otherwise for the business of Ocean Equity, a portion of the investments/loans were actually used for non-business purposes.  Zinner also caused investors to be told that their investments were secured by the assets of Ocean Equity, despite the fact that these same assets had also been pledged by ZINNER to collateralize the loans from SGF.  Based on representations made or caused to be made by ZINNER, both the individual investors/lenders and SGF were under the impression that each was first in line for the assets of the company in the event that Ocean Equity failed.

15.  From 2011-2016, Ocean Equity regularly reported losses on its federal income tax returns.  At the same time, however, ZINNER spent large amounts of company money on personal expenditures, including travel, vehicle expenses, gambling, day-trading, mortgage payments, renovations to his personal residence, medical bills, personal credit cards, a rock band, and other expenditures.   ZINNER's regular spending of company funds, combined with the continued lack of profit from Ocean Equity, created an ongoing need for new funds over and above the operating income of Ocean Equity.  ZINNER attempted to meet this need with money received from investors and loans from SGF.   Investors/lenders in/to Ocean Equity (including SGF) were not aware of ZINNER's spending practices in relation to the financial condition of the company.

16.  From in or about January 2011, through in or about January 2016, approximately $4,359,628 of private investor/lender funds were deposited into Ocean Equity business bank accounts, along with the aforementioned approximately $2,565,194.39 from SGF.  Once the funds were deposited into these business bank accounts, ZINNER frequently made transfers between the business bank accounts and his personal bank accounts.  While some transfers were made from ZINNER's personal accounts back to the business accounts, a net of approximately $2,015,349 was transferred from the Ocean Equity accounts to ZINNER's personal accounts.  In addition, ZINNER used funds directly from the Ocean Equity business for various personal benefit and other purposes.  At no time did ZINNER inform either the individual investors and/or SGF that the invested/loaned funds would be and were transferred to his personal accounts or used for personal expenses.

17.  In or about July 2014, ZINNER sold the credit card processing portfolio of Ocean Equity to an outside company for an upfront payment of $2.2 million and additional earn-out payments.  Approximately $616,000 of

the received funds were used to pay off certain SGF loans. With the remaining funds, ZINNER paid business and personal expenses, made certain merchant cash advances, repaid various lenders and made transfers to his ScottTrade and other personal accounts, all within a twenty-day period.

18. Following the sale of the credit card processing portfolio, the only significant asset of Ocean Equity was the accounts receivable, consisting of the outstanding merchant cash advance income. Thus, the collateral providing security for the investors/lenders was impacted by this sale.

19. In or about April 2016, ZINNER closed down Ocean Equity and moved to Las Vegas, Nevada. At the time that Ocean Equity closed down, there remained two outstanding loans with SGF with an unpaid balance totaling at least $700,000, and at least seven outstanding investors had unpaid balances of approximately $3,229,487. ZINNER provided to both SGF and the investors the same set of collateral accounts receivable from the outstanding merchant cash advance clients. This collateral could not satisfy the debts of both SGF and the investors.

20. In obtaining funds for Ocean Equity, the defendant caused the use of various wire transmissions in interstate commerce, between the Eastern District of Virginia and locations outside the Commonwealth of Virginia.

21. With respect to Count 19 of the Superseding Indictment, on or about September 6, 2012, ZINNER engaged in a monetary transaction through Monarch Bank, a financial institution, that affected interstate commerce, by causing the transfer of $40,000 from Monarch Bank (account number ending 1156) to ZINNER's E*Trade account (account number ending 7905). This transfer represented a portion of $150,000 in fraudulently obtained investor funds from R.S. that had been obtained on September 6, 2012, and was transferred to the aforementioned Monarch Bank account.

22. The defendant stipulates and agrees that his participation in the events described herein was undertaken knowingly, intentionally and unlawfully and not as a result of accident, mistake or other innocent reason.

[Signed by the representative of the United States.]

After consulting with my attorney, I hereby stipulate that the above Statement of Facts are true and accurate, and that had the matter proceeded to trial, the United States could prove these facts beyond a reasonable doubt.

[Signed by the Petitioner, Edward Zinner]

I am counsel for EDWARD ZINNER. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

[Signed by counsel for Zinner]

6

(Statement of Facts, ECF No. 60.)

### B.   Sentencing Proceedings

According to the Presentence Investigation Report ("Sentencing PSR") filed on March 30, 2018, the advisory Guidelines range was 188 to 235 months, but because the statutory maximum sentence for this offense was 120 months, Zinner's restricted Guidelines range was 120 months of imprisonment. (Sentencing PSR, ECF No. 85, Part D.)  The Final PSR filed after Zinner was sentenced reflects the Court's rulings at the sentencing hearing that resulted in a reduced advisory Guidelines range of 78 to 97 months. (PSR, ECF No. 107, Part D.)   The transcript reflects that the Court granted defense objections that resulted in a reduction of the offense level from 34 to 26.  (Apr. 12, 2018 Tr. at 1–150, ECF No. 121.)  On April 12, 2018, after hearing evidence and addressing objections, the Court sentenced Zinner to 120 months of imprisonment to be served consecutively to a state sentence or sentences imposed in Virginia Beach Circuit Court on or about July 26, 2017.  (J. at 1–2, ECF No. 104; Apr. 12, 2018 Tr. at 144–45.)

The record and the PSR reflect that Zinner was taken into federal custody by way of a writ that was issued on March 30, 2017, and the record also reflects that Zinner had time left to serve on the state sentence or sentences imposed in Virginia Beach Circuit Court on or about July 26, 2017. (Petition and Writ, ECF No. 7; Writ, ECF No. 9; PSR ¶¶ 58-59, ECF Nos. 85 & 107; J. at 2; Apr. 12, 2018 Tr. at 144–45.)  BOP records indicate that the sentence or sentences imposed in Virginia Beach Circuit Court have been completed because there is no detainer in place. (Mot. Comp. Release Ex. 4 at 4, ECF No.

169–4.)  Zinner has an anticipated release date of November 4, 2026.  (Mot. Comp. Release at 3; Inmate Locator (bop.gov) & enter Zinner's name or inmate number).

### C.    Post-Conviction Proceedings

On August 8, 2018, Zinner filed a Notice of Appeal as to the Restitution Judgment. On January 7, 2019, the United States Court of Appeals for the Fourth Circuit granted Zinner's motion to voluntarily dismiss and issued its mandate. (ECF Nos. 124, 125.)  Three months later, on April 2, 2019, Zinner filed the § 2255 Motion and the three Motions for Production of Documents and Electronic Stored Information.  The other motions followed.

This case was reassigned from Judge Morgan to Judge Allen on September 3, 2020, and it was reassigned to the undersigned on November 24, 2020.[1]

By Memorandum Opinion and Order issued on January 4, 2022, the Court denied Zinner's *pro se* Motion for Compassionate Release (ECF No. 155), the Motion for Compassionate Release (ECF No. 169) filed by counsel, the Motion to Expedite Release to Home Confinement (ECF No. 172), the *pro se* Motion to Strike (ECF No. 174), and the *pro se* Motion to Remove Counsel (ECF No. 178).  (*See* ECF Nos. 195, 196.)

---

[1] As noted in the Memorandum Opinion issued on January 4, 2022, "while Zinner assigns a nefarious motive to these reassignments [from Judge Morgan to Judge Hudson to Judge Allen to the undersigned] and contends that there has been "judge shopping or judge shuffling" in this case, (*see, e.g.,* ECF No. 193 at 14; ECF No. 187 at 1; ECF No. 178–3 at 7), there is no validity to these claims." (ECF No. 195 at 4 n.4.)

## II. Zinner's Grounds for Relief under 28 U.S.C. § 2255

Zinner has not provided a concise statement of his grounds for relief. In the standardized form § 2255 Motion (ECF No. 126), Zinner demands relief upon the following grounds:

Claim One        "Factual Innocence of the Charged Offenses. Govt's Evidence does not support Factual Guilt, it is in the antithetical, and proves innocence." (§ 2255 Motion at 5[2].)

Claim Two        "Ineffective Assistance of Counsel."
                 "Defense counsel withheld *Brady* evidence from govt. and District Court. This evidence is relevant to guilt and punishment. The evidence also relates to federal crimes committed by the govt.'s witnesses who were bearing false witness against Petitioner in the instant offense." (*Id*. at 6.)

Claim Three      "Vindictive Prosecution."
                 "Facts cannot support the charged offenses. Charged offenses fabricated by prosecutor. History of IRS harassment and filing of erroneous liens and abuse of judicial process resulting in unlawful taking of money under color of law, false arrest and unlawful conviction." (*Id*. at 7.)

Claim Four       "Fraud upon District Court."
                 "More than 25 provable act[s] of perjury and suborning of perjury during sentencing. Fraud upon Grand Jury – known false fabrication of facts absent evidence and known exculpatory evidence disproves case. False conviction obtained on false narrative and fake evidence and perjured testimony." (*Id*. at 9.)

Claim Five       "These issues arose or were exacerbated by defense counsel's failures during the sentencing hearing as well as the prosecutor[']s misconduct. Both counsel were obligated to be truthful with the Court and neither were truthful. Petitioner was denied due process." (*Id*. at 10.)

---

[2] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.

In his 60-page attachment to his § 2255 Motion, Zinner delineates his claims as follows: "I. INEFFECTIVE ASSISTANCE OF COUNSEL – FACTUAL INNOCENCE," (*id*. at 33); "II. INEFFECTIVE ASSISTANCE OF COUNSEL – UNCONSTITUTIONAL SENTENCE BASED UPON INACCURATE FACTS," (*id*. at 39); "V. GOVERNMENT BREACH OF PLEA AGREEMENT," (*id*. at 58); "VI. PROSECUTORIAL MISCONDUCT – FRAUD UPON THE COURT – CIVIL RIGHTS VIOLATION," (*id*. at 60.); and, "VII. VINDICTIVE PROSECUTION – CIVIL RIGHTS VIOLATIONS," (*id*. at 65).[3]

Upon review of his § 2225 Motion and the attachments, the Court deems Zinner to have raised the following claims:[4]

Claim 1    Zinner was denied the effective assistance of counsel in conjunction with preparing for trial and with respect to the decision to plead guilty because Zinner is actually innocent.

Claim 2    "Defense counsel failed to advise the Court at sentencing [of] their knowledge of false information contained in the Indictment, PSR, Statement of Facts, and the Government's Position Paper . . . ." (ECF No. 126, at 16.)

---

[3] In the attachment, Zinner omitted any roman numeral III, and roman numeral IV was titled "LEGAL DISCUSSION AND ARGUMENT." (ECF No. 126, at 54.)

[4] The Court is neither obliged nor inclined to scour the remainder of Zinner's post-conviction submissions to ascertain if additional claims are lurking therein. *See Snyder v. United States*, 263 F. App'x 778, 779–80 (11th Cir. 2008) (refusing to consider petitioner's statement in a reply brief as an attempt to amend his § 2255 motion to add a new claim); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 847 F. Supp. 2d 843, 851 n.9 (E.D. Va. 2012); *Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 111 (W.D. Va. 2007) (citations omitted) (explaining that "new legal theories must be added by way of amended pleadings, not by arguments asserted in legal briefs").

Claim 3    "The prosecution was brought for vindictive reasons including Petitioner being targeted for destruction absent legal justification." (ECF No. 126, at 16.)

Claim 4    The prosecution engaged in misconduct by presenting false evidence.[5]  (*Id.* at 58–65.)

For the reasons set forth below, the Court finds that Claims 3 and 4 are procedurally defaulted and that Zinner's remaining claims lack merit.[6]

## III.  Procedural Default

The procedural default rule bars Claims 3 and 4 from review here, absent a showing of cause and prejudice or actual innocence, because Zinner could have raised, but did not raise, these claims on direct appeal.  *See Bousley v. United States*, 523 U.S. 614, 622–23 (1998); *United States v. Frady*, 456 U.S. 152, 167–68 (1982); *see also United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2008) (internal quotation marks omitted) (citation omitted) (explaining that a petitioner who waives the right to appeal "is not precluded from filing a petition for collateral review.  But he is precluded from raising claims that are the sort that could have been raised on appeal.").  Zinner arguably contends that his default should be excused because of the ineffectiveness of counsel or because of his actual innocence.  For the reasons discussed below, those contentions are frivolous.  Accordingly, Claims 3 and 4 will be DISMISSED.

---

[5] The prosecutorial misconduct claim also includes Zinner's contention that the prosecution somehow breached the Plea Agreement by presenting false evidence.

[6] Each of these claims contains a host of subparts in various stages of development.  The Court has considered each of the subparts and concludes that they lack merit.

## IV.  Ineffective Assistance of Counsel

To demonstrate ineffective assistance of counsel, a convicted defendant must show first, that counsel's representation was deficient and second, that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).  The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice.  *Id.* at 697.

### A.  Guilty Plea

In the context of a guilty plea, the Supreme Court has modified this second prong of *Strickland* to require the convicted defendant to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Of course, in conducting the foregoing inquiry, the representations of the convicted defendant, his lawyer, and the prosecutor during the plea proceedings, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral

proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977).  In light of the strong presumption of verity that attaches to a petitioner's declarations during his plea proceedings, "in the absence of extraordinary circumstances, allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always 'palpably incredible' and 'patently frivolous or false.'" *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (citations omitted).  Thus, the Fourth Circuit has admonished that "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements."  *Id.* at 221–22.  As explained more fully below, no circumstances exist here that would lead the Court to consider Zinner's prior sworn statements as other than truthful.

In his ineffective assistance of counsel claim in Claim 1 and throughout his § 2255 submissions, Zinner seeks to disavow his guilt as to Count 19 and any of the other criminal conduct charged in the Superseding Indictment.   Zinner essentially asserts that nearly every inculpatory fact that he admitted in the Statement of Facts is false and that he is not guilty of any offense.  Zinner may not so easily shed the facts that he previously assured the Court, under oath, were true.  *See id.*; *United States v. Stewart*, 198 F.3d 984, 987 (7th Cir. 1999) ("Entry of a plea is not some empty ceremony, and statements made to a federal judge in open court are not trifles that defendants may elect to disregard.  A defendant has no legal entitlement to benefit by contradicting himself under oath.").

During his Rule 11 proceeding, after several minutes of questions and answers

13

between the Court and Zinner and, to a lesser extent, between the Court and counsel, Zinner

provided the following sworn statement in response to the Court's questions:

> THE COURT: All right. Edward Zinner, you are charged in Count 19 of the indictment with engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957. How do you plead to the charges in Count 19 of the superseding indictment?
> THE DEFENDANT: Guilty.
> THE COURT: Are you entering this plea of guilty voluntarily and not because you have been coerced to do so?
> THE DEFENDANT: Yes.
> THE COURT: Do you understand the constitutional rights that you give up by entering a plea of guilty?
> THE DEFENDANT: I do.
> THE COURT: Are you pleading guilty because you believe you are guilty of this offense charged in Count 19 of the superseding indictment?
> THE DEFENDANT: Yes.
> THE COURT: All right. The Court was furnished with a statement of facts prior to this hearing, but I -- a comprehensive statement of facts which I have reviewed. There was one alteration to the statement of facts as well that had to do with the amount of money. If the content of the statement of facts is accurate and true, then that would lead the Court to believe that there is sufficient evidence beyond your plea of guilty to persuade the Court beyond a reasonable doubt that you are guilty of a violation of Count 19. Did you have an opportunity to thoroughly review the statement of facts and discuss it with your attorneys?
> THE DEFENDANT: I have.
> THE COURT: And after you reviewed, signed, and initialed the statement of facts, did you conclude that it was true and accurate?
> THE DEFENDANT: Yes.

(Oct. 17, 2017 Tr., ECF No. 123, at 19–20.) Zinner has failed to direct the Court to any

extraordinary circumstance that would permit him to contradict his prior sworn statements

in these proceedings. Therefore, the Court concludes his present contradictory statements

are "'palpably incredible' and 'patently frivolous or false.'" *Lemaster*, 403 F.3d at 221.

Relatedly, Zinner's contention that he is actually innocent is foreclosed by the record and

is dismissed.  *See Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005) (citations omitted) ("It is difficult to see how a collateral attack based on the proposition that the petitioner's own trial testimony was a pack of lies has any prospect of success.  Litigants must live with the stories that they tell under oath."), *abrogated on other grounds by McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013).

  Zinner's claim of ineffective assistance of counsel fails at the outset because he fails to allege that, but the ineffective assistance of counsel, he would have pled not guilty and insisted on going to trial.  *See Hill*, 474 U.S. at 60 (concluding the absence of such an allegation is fatal to a claim of ineffective assistance of counsel with respect to the decision to plead guilty).  Moreover, even if Zinner had asserted that he would not have pled guilty if he had received better assistance from counsel, his assertion is not dispositive of the issue.  *See United States v. Mora-Gomez*, 875 F. Supp. 1208, 1214 (E.D. Va. 1995). Rather, "[t]his is an objective inquiry and dependent on the likely outcome of a trial had the defendant not pleaded guilty." *Meyer v. Branker*, 506 F.3d 358, 369 (4th Cir. 2007) (internal citation omitted) (citing *Hill*, 474 U.S. at 59-60).  The Court looks to all the facts and circumstances surrounding a petitioner's plea, including the likelihood of conviction and any potential sentencing benefit to pleading guilty.  *Id.* at 369–70.  As explained below, those facts clearly demonstrate that Zinner was not prejudiced by any omission of counsel.

  By pleading guilty, Zinner capped his maximum sentence at ten years.  If Zinner had been convicted on even one count of wire fraud, he faced an additional twenty years of imprisonment.  As reflected by the Statement of Facts, Zinner's conviction on Count Nineteen and one or more counts of wire fraud charged in Counts One through Seventeen

was a foregone conclusion.   Thus, any reasonable defendant in Zinner's position would have chosen to plead guilty pursuant to the Plea Agreement, rather than go to trial and face an even longer sentence.[7]   Accordingly, Claim 1 will be DISMISSED because Zinner fails to demonstrate any prejudice.

## B.   Sentencing

Next, Zinner contends that he was denied the effective assistance of counsel at sentencing.   Zinner asserts, *inter alia*, that counsel failed to raise issues related to:

> (1); Petitioner's vehement objections to false statements contained in the Indictment that are directly related to, and which form the erroneous factual basis for the offense conduct; AND (2) . . .  the false statements Petitioner objected to in the Indictment [that] permeated into the Statement of Facts, PSR and Position Paper; AND (3) Petitioner's protests of innocence in notes to counsel for over a year; AND (4) . . .  irrefutable evidence that disproves Samuel's fabrications regarding the charged offense conduct as well as evidence of government witness Noth's federal crimes including his now proven false statements upon which much of the offense conduct is predicated; AND (5) . . . the actual loan agreements between Super G and OEPS, as well as, the loan agreements between OEG and the private lenders which prove impossible the charged offense conduct to factually exist; and [(6)] . . . other supporting documents that provide irrefutable proof that the charged offense conduct cannot and does not factually exist . . . .

---

[7] Zinner's post-plea conduct further supports the conclusion that Zinner cannot demonstrate prejudice.  After pleading guilty, Zinner wished to pursue a sentencing strategy that insisted on his innocence.  (ECF No. 146–1, at 5.)  Zinner's attorneys swear that they

> counselled Mr. Zinner that his post-guilty plea desire to object to everything in the PSR and effectively proclaim his innocence should be done through a withdrawal of his plea rather than at sentencing. We discussed the standard for moving to withdraw a guilty plea that had already been accepted by the Court and we advised Mr. Zinner against moving to withdraw his plea. . . .  Mr. Zinner went back and forth many times, but ultimately decided against filing a motion to withdraw his guilty plea.

(*Id.* at 5–6.)  Zinner's vehement desire to proclaim his innocence, then as now, is eclipsed by his knowledge that he was guilty and would face a far longer sentence if he went to trial.

(ECF No. 126, at 44.)  Additionally, Zinner faults counsel for agreeing to the loss amount

set forth in the Sentencing PSR.  (*Id.* at 44–45.)

> Defense counsel acknowledge that
>
> Mr. Zinner repeatedly instructed his lawyers to contest a great number of
> factual issues, both through pretrial litigation and at sentencing.  It is also
> true that defense counsel decided that it would not be a good sentencing
> strategy to contest every issue that Mr. Zinner instructed his attorneys to
> contest.  We exercised our judgment to focus on issues that we thought were
> material to sentencing, consistent with Mr. Zinner's plea of guilty, and likely
> to have some reasonable chance of success. Oftentimes, Mr. Zinner
> vehemently disagreed with his lawyers' judgment on those points.  Mr.
> Zinner is correct, for example, that he strongly favored putting forward
> valuations of the company that included "revenue to receive" (or "RTR") as
> a valuable company asset. *See, e.g.*, ECF No. 126, at 30-37.  It was our view,
> informed by consultation with a forensic accountant, that Mr. Zinner was
> highly overvaluing the "RTR" as an asset. We believed that attempting to
> argue that OEG's RTR was a highly valuable asset would undermine the
> credibility of our better arguments. We agree with Mr. Zinner's sentiment
> that that this was not the decision Mr. Zinner would have made had he been
> representing himself.

(ECF 146–1, at 2–3.)  With respect to the double pledging of assets, defense counsel noted

that, "Mr. Zinner stipulated to the double-pledging theory of fraud in Paragraph 14 of the

Statement of Facts.  ECF No. 60, at 5.  Accordingly, defense counsel did not believe it was

a good strategy at sentencing to attempt to disprove this stipulated fact."  (*Id.* at 5.)  Further,

counsel swear that there did not exist or they were unaware of any "irrefutable evidence

that made the government's case impossible to prove . . . ."  (*Id.* at 3.)

> Defense counsel provided the following explanation of their actions with respect to

potential government witness, Jim Noth:

> Mr. Zinner asserts that defense counsel learned that Jim Noth had
> stolen money from Steve Martini and committed various offenses yet defense
> counsel hid that information from Court and refused to discuss it with the

prosecutor.  ECF No. 126, at 21 & 34.  Mr. Zinner is correct that, by no later than October 5, 2017, the defense had obtained credible evidence that Noth lied to government agents when he was interviewed, which is probably a crime.  In sum, Noth told government investigators that he had started a merchant cash advance company called Intell Card after leaving OEG, which was true.  But Noth further told agents that 1) Intell Card "did not have any credit card processing customers," and 2) that no one who had been affiliated with or invested in OEG had invested in Intell Card.  Noth told the defense team that Intell Card did processing and merchant cash advances.  He also confirmed that Martini, an OEG investor, had not only invested in Intell Card but also had lost his money.  We were able to verify that Martini had sued Noth over this Intell Card investment.  Had the case gone to trial, the defense would have been, in part, that Noth (rather than Zinner) was responsible for obtaining loans from various individuals and that Noth (rather than Zinner) was responsible for making any misrepresentations to the individual lenders.  Thus, evidence that Noth had lied to federal agents about what he had been doing through Intell Card and who had invested in his company would have been valuable impeachment evidence against Noth at trial.  Noth had lied about the nature of Intell Card's business (suggesting incorrectly that he was not engaged in the exact same business that OEG had done) and he lied about who had invested in Intell Card (specifically disclaiming that people, like Martini, who had invested in OEG had also invested in Intell Card).  This would have allowed the defense to more persuasively assert that Noth was lying when he said that Mr. Zinner was responsible for the representations he made to potential lenders when seeking loans to OEG.  And it would have been useful to undermine Noth's credibility more generally.  The trial value of this evidence was greater if the government was not aware of it until trial, which is why we did not share this evidence with the government before trial.  And once Mr. Zinner accepted a guilty plea, the evidence related to Noth became largely irrelevant to Mr. Zinner's mitigation case at sentencing.  So we did not present this evidence to the Court at sentencing or at any other time.  In sum, it is true that this information about Noth existed and that we did not share this information with the prosecutor or the Court.

(*Id.* at 4–5.)[8]

---

[8] Nevertheless, at sentencing, on cross-examination, defense counsel cross-examined James Adams, an investor.  (ECF No. 121, at 107.)  Counsel elicited from Adams that James Noth was the primary individual who dealt with the investors.  (*Id.*)

At sentencing, the Court sustained defense counsels' objections to use of a minor, obstruction of justice, the loss amount pursuant to USSG § 2B1.1(b)(1)(J), and to the amount derived of more than $1,000,000.00 in gross receipts from a financial institution, and reduced his offense level by eight levels, from 34 to 26. (PSR, ECF No. 107 ¶¶ 30, 31, 35, 38, 42, 43, 44, 48.)  Defense counsels' decision to not pursue the additional objections and arguments that Zinner urges here was eminently reasonable.  Counsel appreciated that Zinner's arguments could jeopardize the benefits Zinner received for acceptance of responsibility and would not be successful considering Zinner's prior sworn statements at the Rule 11 proceedings.  Moreover, it was apparent that there were numerous individuals who were severely victimized by Zinner's fraudulent conduct.  A prolonged sentencing defense that sought to exonerate Zinner or diminish his criminal conduct would not demonstrate remorse and could only harm his chances for leniency.   Accordingly, Zinner fails to demonstrate the counsel performed deficiently.

Second, Zinner fails to demonstrate any reasonable probability that he would have received a lesser sentence had counsel pursued the arguments he urges here.  As noted above, Zinner's arguments have the tone deaf notion that he is somehow a victim in this prosecution and that his conduct was not particularly egregious.   Arguments of that ilk would not have resulted in a lesser sentence considering his past and present criminal conduct.[9]  Accordingly, Claim 2 will be DISMISSED.

---

[9] In imposing an upward variance, the Court noted:

> I don't think the guidelines properly reflect the seriousness of this offense. The
> defendant put himself first in every situation.  Whenever money came in, he applied

### C. Alleged Ineffective Assistance of Counsel as Cause

"[C]ause" refers to "some objective factor external to the defense [that] impeded counsel's [or petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Zinner contends that ineffective assistance of counsel constitutes cause to excuse the default of his claims of vindictive prosecution and prosecutorial misconduct.

### 1. Alleged Vindictive Prosecution (Claim 3)

"A criminal defendant faces a substantial burden in bringing a vindictive prosecution claim. A 'presumption of regularity' attends decisions to prosecute." *United States v. Johnson*, 325 F.3d 205, 210 (4th Cir. 2003) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). The United States Court of Appeals for the Fourth Circuit has held that, in order for the defendant "[t]o establish prosecutorial vindictiveness, [he] 'must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus.'" *United States v. Jackson*, 327 F.3d 273, 294 (4th Cir. 2003) (quoting *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001)). "In the ordinary case, so long as the

---

it first to his personal needs and, thereafter, to his business needs and not at all to the needs of the investors. It's not the first time he's done such a thing, notwithstanding his continued protest to his prior agreement for similar behavior.

So while, technically, the government has not proven some of the enhancements, the effect of reducing his [guidelines] I think, reduces it less than what is an appropriate sentence in this case considering the 3553 factors. Should the defendant be released, his history suggests that he would be very likely to repeat these offenses.

(ECF No. 121, at 143–44.)

prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . generally rests entirely in his discretion." *Armstrong*, 517 U.S. at 464.

Zinner's claim of vindictive prosecution is frivolous. Zinner has a long history of passing worthless checks and defrauding individuals, including a 1995 conviction in the United States District Court for the Eastern District of Pennsylvania for racketeering. (PSR, ECF No. 107 ¶¶ 52–54, 57.) Zinner contends that "throughout the 1990's and continuing through 2019," various prosecutors and the Internal Revenue Service conspired against him and once again "produc[ed] yet another unjust, unconstitutional conviction and sentence." (ECF No. 126, at 29.) Zinner contends that his current prosecution was motivated by his continuing attacks on his 1995 racketeering conviction and restitution obligations. (*Id.* at 65–72.) Counsel reasonably perceived that there was no objective evidence of genuine animus and that the decision to prosecute was driven not by any impermissible motive, but by the need to hold Zinner accountable for his continuing criminal conduct. Indeed, the objective evidence in the record clearly supports the Government's decision to prosecute Zinner in federal court. "Given the facts adduced . . ., especially in light of [Zinner's] own admission[s], the Government clearly had probable cause to believe that [Zinner] committed the charged offenses." *United States v. Woods*, 305 F. App'x 964, 967 (4th Cir. 2009) (citing *Armstrong*, 517 U.S. at 464). Counsel reasonably eschewed pursuing a claim of vindictive prosecution based on any of theories advanced here by Zinner. Therefore, Zinner has failed to establish cause and prejudice to excuse his default of Claim 3.

## 2.     Alleged Prosecutorial Misconduct (Claim 4)

In Claim 4, Zinner contends that the prosecution engaged in numerous acts of misconduct, including presenting false evidence.  Given that Zinner's own admissions at Rule 11 proceedings reflected the truth of numerous statements that he now insists are false, counsel reasonably perceived that pursuing charges of prosecutorial misconduct had little chance of success.  Furthermore, such claims may have driven the prosecution to conclude that a full trial and a stiffer sentence was a more appropriate method for resolving Zinner's criminal charges.  Given these facts, and the general lack of merit to his claims of prosecutorial misconduct, counsel acted reasonably in declining to pursue claims of prosecutorial misconduct.   Accordingly, Zinner fails to demonstrate cause and prejudice to excuse his default of Claim 4.

## V.  Zinner's Other Submissions

Zinner has an additional eleven motions related to his 28 U.S.C. § 2255 motion.  The majority of these motions relate to discovery.  A defendant, pursuing a 28 U.S.C. § 2255 motion, "unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Discovery is only granted upon a showing of good cause.  *United States v. Echols*, 671 F. App'x 64, 65 (4th Cir. 2016) (citing Rule 6, Rules Governing § 2255 Proceedings).  In order to establish good cause, a "movant must make specific allegations establishing reason to believe that, if the facts are fully developed, he is entitled to relief." *Id.* (citing *United States v. Roane*, 378 F.3d 382, 403 (4th Cir. 2004)).   For the reasons discussed above, Zinner fails to demonstrate that any fuller development of the facts would entitle him to relief.

Accordingly, the first Motion for Production of Documents and Electronic Stored Information (ECF No. 127), the second Motion for Production of Documents and Electronic Stored Information (ECF No. 128), the third Motion for Production of Documents and Electronic Stored Information (ECF No. 129), the "Motion to Quash Order Precluding Petitioner from Possessing Jencks/Giglio Disclosures and/or Grand Jury Minutes and for Production of all Jencks/Giglio Disclosures and Grand Jury Minutes" (ECF No. 138), the "Motion to Compel Production of Brady Evidence withheld from Defense Counsel" (ECF No. 139), the "Amended Motion to Compel Production of Brady Evidence withheld from Defense Counsel" (ECF No. 151), and the Motion for Leave to Conduct Discovery (ECF No. 157) will be DENIED.

Zinner has filed a number of motions seeking an evidentiary hearing. No hearing is necessary to resolve his claims. *See Raines v. United States*, 423 F.2d 526, 531 (4th Cir. 1970) ("Allegations of 'a vague, conclusory or palpably incredible nature' do not raise factual issues which require a full hearing." (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962))). Accordingly, the "Request for Evidentiary Hearing & Memorandum of Law" accompanied by a 124-page exhibit (ECF Nos. 150, 150–1) and Motion for Hearing[10] (ECF No. 184) will be DENIED.

---

[10] In the Motion for Hearing, Zinner contends that the Plea Agreement was breached and he was denied effective assistance of counsel because the PSR contained an adjustment for obstruction of justice based on Zinner's failure to turn over QuickBooks records as required by a grand jury subpoena and the throwing of business records into a dumpster. (*See* ECF No. 184, at 1–3; ECF No. 66 ¶ 31.) Zinner contends that by seeking an enhancement for obstruction of justice, the Government violated that provision of the Plea Agreement wherein the Government agreed not to further prosecute "for the specific conduct described in the superseding indictment or statement of facts, for any potential criminal tax charges arising from such conduct, or for any conduct related to the compliance with subpoenas issued to his businesses in April 2016." (ECF No. 59 ¶ 9.) The

Zinner has filed "Motion to Quash Detention Order Denying Bond and Strike It from the Record for Fraud upon the Court by AUSA Samuels" (ECF No. 149). That motion is not supported by law or fact and will be DENIED.

Lastly, Zinner has filed "a Motion for Court to Take Judicial Notice of Facts pursuant to Rule 201 Federal Rules of Evidence (ECF No. 180). In that Motion, Zinner requests that the Court take judicial notice of a variety of facts related to, *inter alia*, the business records of Ocean Equity, the private lender agreements, and alleged deceptive practices of Assistant United States Attorney Samuels. Zinner fails to demonstrate that such a motion is appropriate in these proceedings or that the facts alleged are subject to judicial notice. Accordingly, the Motion (ECF No. 180) will be DENIED.

## VI.    Conclusion

Zinner's claims will be DISMISSED. The § 2255 Motion (ECF No. 126) will be DENIED. His outstanding Motions (ECF No. 127), (ECF No. 128), (ECF No. 129), (ECF No. 138), (ECF No. 139), (ECF No. 149), (ECF Nos. 150, 150–1), (ECF No. 151), (ECF No. 157), (ECF No. 180), and (ECF No. 184) will be DENIED. The action will be

---

Government did not "further prosecute" Zinner when it supplied information relating to Zinner's offense of conviction to the probation office so that "it could be considered relevant conduct related to the precise offense" to which he pleaded guilty. *See United States v. Baker*, 19 F. App'x 223, 228 (6th Cir. 2001). Ultimately, as discussed previously herein, the Court granted the defense objection to this enhancement. (PSR, ECF No. 107 ¶¶ 31, 43).

DISMISSED.  A certificate of appealability will be DENIED.[11]

An appropriate Final Order will follow.

/s/ _____
Roderick C. Young
United States District Judge

Norfolk, Virginia
Date:  March 17, 2022

---

[11] An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(B). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Zinner has not satisfied this standard.